## LUTHER SHELDON *versus* 1he CONGREGATIONAI PARISH IN EASTON.

The refusal of a minister to comply with the request of his parish, that he would make exchanges with other ministers in the vicinity, is not a sufficient ground for a recommendation by an ecclesiastical council, that his connexion with the parish be dissolved.

Sc of his neglect to reply to and utter disregard of communications from the parish on that subject.

The finding by an ecclesiastical council, as a cause for recommending the dissolution of the connexion between a minister and his parish, that he had " lost the confidence of a large portion of his parishioners in his moral honesty and integrity," was *held* to be too vague and general, as it did not show whether such portion was a minority or majority of the parishioners, nor that the loss of confidence was owing to any fault on the part of the minister.

ASSUMPSIT by the plaintiff, as a minister of the gospel, to recover his salary for a year, commencing on the 24th of October, 1832.

On a case stated it appears, that the parish was incorporated on the 7th of February, 1792. The plaintiff was duly ordained as minister of the parish, on the 24th of October, 1810, since which time, and until prevented as mentioned below, he has officiated as minister of the parish, and has received his salary from year to year up to the 24th of October, 1832. In the contract made between the parties previously to the plaintiff's ordination, was the following clause : " Agreed, that in case any root of bitterness shall arise among us, so that the minds of two thirds of the members of said parish shall be alienated from their minister, by giving him one year's notice that they do not desire his continuance with them as a minister any longer, he may be discharged with a mutual council. And so on the other hand, if he, the said minister, shall be discontented with his situation among this people, and shall wish to be discharged from his connexion with this people as a minister, by giving them one year's notice thereof he may be discharged with a mutual council."

On the 16th of September, 1832, the plaintiff was prevented, and has ever since been prevented, by the defendants, from preaching in their meetinghouse, and has since performed the services of public worship, first, in another house in

Easton, and afterwards in a new meetinghouse, built for that purpose, in which houses such members of the parish as chose so to do, attended; and has also performed other parochial duties among such of the parish as chose to receive his services.

On November 7th, 1831, the parish voted to request the plaintiff " to exchange pulpit services with the neighbouring congregational ministers indiscriminately, agreeable to the prac· tice that prevailed at the time of his settlement ;" and a committee was appointed to communicate this vote to the plaintiff and· request an answer in writing. The committee communicated this vote to the plaintiff, but he made no answer.

On the 16th of April, 1832, the committee appointed at the last meeting made a report, which was accepted by vote of the parish. In the report the committee state that the plaintiff has not seen fit to make either the reply or the exchanges, agreea bly to the vote of the parish; and that in the opinion of the committee, the parish are exonerated from their contract with the plaintiff.

At a parish meeting held on June 4th, 1832, by adjournment from May 12th, it was voted, that the trustees of the par ish be instructed to communicate to the plaintiff the proceedings of the meeting held on the 16th of April, and that they be authorized and instructed to propose to him to continue to officiate as the minister of the parish, provided he will conform to the customs and usages of the parish, in his exchanges with the congregational ministers in the vicinity, agreeably to the request of the parish, and in case he shall not consent to con tinue on these terms, they shall propose to him to join in calling a mutual ecclesiastical council, to dissolve the existing relations between him and the parish; and if he shall refuse or neglect to join in calling a mutual council, they are authorized and instructed to call an *ex parte* council for that purpose.

On the 23d of July, 1832, the trustees made a written communication to the plaintiff, in which, in behalf of the parish, they propose to join in calling a mutual ecclesiastical council to dissolve the existing relations between him and the parish, agreeably to a vote of the parish; to which proposition they request an immediate answer.

On the 24th of August, 1832, the committee, having then

received no answer, sent out letters missive for an *ex parte* council to convene on the 6th of September.

On the 30th of August, 1832, the committee received a communication from the plaintiff, dated the 20th of August, in which he declines joining with them in electing a mutual council, for the purpose stated in the parish vote of June 4th, and assigns his reasons.

On the 6th of September the *ex parte* council assembled at Easton, and the plaintiff, upon notice, attended and offered objections to their jurisdiction ; which objections were over-ruled. The council proceeded to the examination of the charges against the plaintiff and came to the following result : " That this council considers the charges relating to the exclusive course which the Rev. Mr. Sheldon has pursued in regard to ministerial exchanges, in opposition to the practice of his predecessors and his own early practice, in opposition to the principles upon which he was settled, as mutually understood by his parishioners and himself, and against the repeated remonstrances of respectable committees and the votes of the parish officially communicated to him, — his neglect to reply to all such communications and utter disregard of them, — and his loss of the confidence of a large portion of his parishioners in his moral honesty and integrity, — having been substantiated by the evidence offered by the committee on the part of the parish, require a dissolution of the ministerial connexion now subsisting between him and said parish, there appearing to be no grounds for a belief that peace and harmony can otherwise be restored to said parish."

On the 8th of September the trustees communicated to the plaintiff a copy of the proceedings of the council, and gave him notice, that in accordance with the votes of the parish the trustees had made arrangements for supplying the pulpit after the following Sunday, and that after that day the parish would dispense with his services.

The plaintiff, on the 24th of September, gave notice to the trustees, that he considered himself the regular minister of the parish, and that he held himself in readiness to perform the duties of his office, according to agreement, whenever it should be their pleasure to admit them.

Sheldon
*v.*
Congr. Par-
ish in
Easton.

At a parish meeting on the 1st of April, 1833, the trustees made a report of the proceedings which had been had in relation to the plaintiff, and that from the 9th of September, 1832, they had supplied the pulpit agreeably to their instructions. The report was accepted, and it was voted that the trustees be a committee to supply the pulpit and take care of the meetinghouse.

The act of February 7th, 1792, provides, that " all inhabitants of the town of Easton, &c. who now usually attend, and who shall hereafter usually attend public worship with the congregational society, &c., and who shall cause their names to be entered and registered with the clerk of such society," shall be made a corporation by the name of the Congregational Parish in Easton. In the book of parish records is a list of one hundred and nineteen names, headed, " List of persons' names belonging to the Congregational Parish in Easton, April 24, 1809." Of these persons more than one half had died or left the parish before June 1832. The meetings of the parish have not been held exclusively by the persons named in this list, but at the meetings at which the votes above mentioned relating to the plaintiff were passed, all persons, inhabitants of Easton, who had not joined other societies, were permitted to vote, and the presiding officers declared that they should admit the claims of all such persons to be members of the parish ; and many persons voted on the occasions referred to, whose names were not on the list. To this statement respecting the persons who were permitted to vote, the defendants object as incompetent evidence ; and if it be so, it is not to be in the case.

There were other facts, which the decision of the Court rendered unimportant.

If the plaintiff was entitled to recover, judgment was to be entered accordingly ; if not, he was to become nonsuit.

Oct. 22d,
1835, at
Plymouth.

*Warren*, *Eddy* and *Colby*, for the plaintiff.

*F. Dexter* and *Lothrop*, for the defendants, contended that under the circumstances of this case the plaintiff's refusal to make exchanges with the neighbouring congregational ministers, was such a cause of complaint as would justify the council in recommending, and the parish in voting, the dismission of the plaintiff. At the time of his settlement it had been customary

to make such exchanges, and the parish had reason to expect that he would conform to the usage ; as in fact, for a time, he did. Of late, when frequently requested by his parish to make exchanges, he treated the applications with contemptuous silence. It is said the custom is not a good one ; and it is true, that according to the rules of the common law, it cannot be supported. But it is not to be tried by those rules. As it ought to be viewed, it is a good custom. It is a part of our ecclesiastical common law. It is a custom not to be enforced in the case of some particular individual, and yet good in the general. The parish have a right, perhaps an imperfect right, to require the usage to be continued ; and if the minister breaks it up, he should at least give his reasons for so doing. The plaintiff asserts that it is a matter of conscience with him to exclude from his pulpit ministers who inculcate doctrines differing from his own. But there is more than one conscience in the parish ; and if the consciences of a majority of the parishioners are not offended by the ministrations of the neighbouring clergy, it is not for him to object. If his conscience will not sanction it, he should ask a dismission. The council have found this charge against the plaintiff to be true, and the state of the parish to be such that harmony could not be restored except by a dissolution of their ministerial connexion with the plaintiff; and these grounds were sufficient to warrant their recommendation that the connexion should be dissolved.

The counsel for the defendants did not rely on the charge of loss of confidence in the plaintiff's moral honesty and integrity.

MORTON J. delivered the opinion of the Court. The plaintiff having been regularly settled over the Congregational Parish in Easton, having at all times been ready to perform all the duties to them growing out of the relation thus created, and having in fact performed such parochial duties as they would permit him to perform, is clearly entitled to recover the stipulated salary so long as that relation continued. *Thompson* v. *Cath. Cong. Soc. in Rehoboth*, 5 Pick. 469.

The only question therefore for our determination is whether this relation has ever been legally dissolved. In the consideration of this question, we come directly to the examination of

*Sheldon v. Congr. Parish in Easton.*

*April term 1836, at Taunton.*

the proceedings of the council. And the view which we have taken of their *result*, supersedes the necessity of inquiring into the legality of the parish meetings, and of the admission or rejection of votes, and the propriety of calling an *ex parte* council.

The settlement of a minister over a congregational church and society, without any limitations as to its continuance or any express stipulations as to the mode of its dissolution, is a contract for life, determinable only in the manner and for the causes established by law. *Avery* v. *Tyringham*, 3 Mass. R. 160 ; *Burr* v. *Sandwich*, 9 Mass. R. 277. There is nothing in the nature of this relation, however solemn and important it may be, which prevents the parties from introducing express qualifications of its general import, as to duration, the mode of discharging its obligations, and the manner and terms of its dissolution. The contract between the parties in this case was, when it was made, somewhat novel and peculiar · but from a change of public opinion on the subject, such contracts have now become common, and in many cases are undoubtedly expedient and wise. It is now generally understood, by pastors and people, that the usefulness of a clergyman depends on the love and confidence of his parishioners ; and that whatever may be the nature of his settlement, when these cease, his duty to remain with them also ceases.

We are not aware, however, that the special provisions in the terms of the plaintiff's settlement can have any bearing upon the question before us. The parties have never dissolved the contract by mutual consent, nor have the defendants, on their part, performed the terms upon which the plaintiff agreed to be dismissed. But the introduction of these special stipulations did not affect the nature of the contract, nor limit its import any further than the express agreements extended. These not being executed, the plaintiff held his office by the same tenure, and might forfeit it for the same causes, as if the terms of his settlement had been general.

Every congregational minister may forfeit his office by certain misfeasances and nonfeasances. What these are seems to be well settled in the numerous cases which this Court unfor-

tunately have from time to time been called upon to decide. There are three established causes of forfeiture :

1. An essential change of doctrine ;
2. A wilful neglect of duty ; and
3. Immoral or criminal conduct.

The contract is a mutual one. Its obligations are reciprocal and dependent. If the pastor neglects, or voluntarily renders himself incompetent, to perform his duties to his parishioners, they are absolved from their obligations to him, and thus the contract is terminated.

But a contract so solemn and important, and a relation so interesting to the parties, and so connected with their future as well as present welfare, is not to be dissolved lightly or for slight causes. A clergyman, before he assumes the high duties of pastor, is bound fully and frankly to disclose his theological tenets, and impliedly undertakes to continue of the same faith and to preach the same doctrines. If he changes these, he ceases to perform one of the conditions of his settlement, and entitles the parish to a dissolution of the contract. But it is not every change of opinion or variation of belief, which will be sufficient to produce this effect. It must be a substantial and essential change, the adoption of "a new system of divinity," so that the parishioners "are obliged to hear doctrines which they disapprove and which they do not believe." But this subject is more peculiarly fit for the investigation of an ecclesiastical council, and can only come before this Court through the jurisdiction of such a tribunal. *Burr* v. *The First Parish in Sandwich*, 9 Mass. R. 277.

So in relation to the other causes of forfeiture, it is not every neglect of duty, or every immoral act, that will furnish sufficient ground for the termination of this relation. They must be gross ; such as disqualify the pastor for the proper discharge of his sacred functions. A wilful omission to preach, to administer the ordinances, or to perform other usual and important parochial duties, would undoubtedly be nonfeasances which would work a forfeiture. But there are a variety of ways of performing the almost innumerable duties which devolve upon a clergyman, and so much difference of opinion as to what are the proper functions of that office, that it would be

unwise to make the pastoral relation depend upon the neglect of any but the most obvious and essential duties. Great allowance should ever be made for peculiarity of opinion, taste and character. *Avery* v. *Tyringham*, 3 Mass. R. 160.

Morality and virtue are indispensable to the clerical character. "A minister of the gospel is separated from the world by his public ordination, and carries with him constantly, whether in or out of the pulpit, superior obligations to exhibit in his whole deportment the purity of that religion which he professes to teach." *Chaddock* v. *Briggs*, 13 Mass. R. 248. His example is often as useful as his instruction. Indeed without a good example, his preaching would be vain ; and the performance of his sacred functions an offence. But perfection is unattainable in any profession, and without a proper allowance for the infirmities of our nature, many of the relations of life could never be sustained. It is not every trifling deviation from duty, every aberration from strict propriety, which will warrant the dismission of a minister. Occasional inadvertencies, perhaps repented of as soon as committed, "imprudence, folly, censoriousness, a spirit of persecution," &c. "are immoralities, but not such as would *per se* defeat a contract of this nature." The immoralities which are "sufficient to jus tify a parish in dismissing their minister," "are of the grosser sort : such as habitual intemperance, lying, unchaste or immodest behaviour, &c." *Thompson* v. *The Cath. Cong. Soc. in Rehoboth*, 5 Pick. 469.

But when these causes are affirmed to exist, how are the allegations to be tried ? Of the first, an ecclesiastical council alone has jurisdiction, and in relation to the other two, that body is manifestly the most proper tribunal for their investigation. A parish may, however, without the intervention of a council, act upon them. But they act at their peril, and their decision can be supported only by affirmative proof of the truth of the charges. Being parties, their decision is not evidence in their favor. Not so with the result of a council. In a proper case for a council, their adjudication, regularly made, is sufficient evidence of the facts determined by them.

An ecclesiastical council is a judicial tribunal, whose province it is, upon the proper presentation of charges, to try

them on evidence admissible before such a tribunal. They have no power to dissolve a contract or to absolve either party from its obligation. They may not only try and determine the existence of the causes which work a forfeiture of the clerical office, but they may also, and this seems to be their appropriate and peculiar duty, give their advice in cases where there is no forfeiture. And well would it be for parishes and pastors, were such advice more frequently followed.

The council determined that they were regularly convened and duly authorized to proceed in the investigation of the charges exhibited against the plaintiff, and they accordingly did proceed, and decided that the charges were substantiated and were sufficient to dissolve the contract which had existed between the parties. As the causes assigned in this result of council for the dismission of the plaintiff, seem to us most clearly to be insufficient for that purpose, we have deemed it more proper to give our opinion upon the effect of this adjudication, than to look minutely into the organization of the body which made it. We therefore, without intending to intimate an opinion upon the point, assume that the council was regularly convened, and that its result is sufficient evidence of the truth of the charges contained in it.

We will briefly examine the causes assigned for the dissolution of the solemn relation between a parish and its pastor ; which has not inaptly been compared to the marriage contract. They are three.

1. The plaintiff's " exclusive course in regard to ministerial exchanges ; "

2. " His neglect to reply to communications " from committees of the parish ; and

3. " His loss of the confidence of a large portion of his parishioners in his moral honesty and integrity."

Now it is not our province to give *advice* to these parties, as to their duty in reference to the facts here disclosed, nor to express an opinion whether it would be for their peace and happiness and in accordance with their duty, to dissolve by mutual consent the relation which exists. Our only duty is to declare the law as applicable to the facts in the case. And perhaps it would be sufficient to declare, that neither of the

three causes which have heretofore been holden to amount to an official forfeiture, appears here to exist. We have no disposition to add to the number, and we know of no principle which would justify their extension. But we will examine the new causes now proposed to be added to the list.

1. *Ministerial exchanges.* It is not unusual for clergymen to confine their exchanges to their brethren of their own denomination or of their own peculiar tenets. This may be a wise or an unwise course ; but of this we are not the judges. We are only to decide upon the legal obligations of the parties. There is no such uniformity of usage in relation to exchanges, as to enter into or affect the contract of settlement. Nor is a newly settled clergyman bound by " the practice of his predecessor, or his own early practice." Were it so, he would not be at liberty to make any improvements on either. He may therefore vary from either when in his judgment he can thereby add to his own convenience or usefulness. Nor is he bound, in this respect, by the directions of his parish. It is not known to be usual for clergymen to consult their parishes in relation to their exchanges. The advice of individual members of the church and society is doubtless often sought and given, and should have its proper influence. There is very little danger that it will not be sufficiently regarded. But we know of no legal obligation upon the pastor to follow the advice or direction of his parishioners in his exchanges, whether they be given individually or collectively. We do not understand the council to decide that here was any thing in the nature of a contract entered into, by which the mode of exchanges was to be regulated. It would not be easy to make such a contract. Parishes are often changing clergymen. And clergymen are frequently changing their tenets. On the whole it seems to us very clear, that a clergyman has a right to select his own associates and to regulate his own intercourse, whether social or professional, without incurring a forfeiture of his office. Whether he shall officiate in his own pulpit wholly himself, or invite others, and whom he shall invite, are matters which he may, within reasonable bounds, regulate by his own discretion.

2. The plaintiff's " neglect to reply to " and " his utter

disregard " of the communications of his parish, may have been uncivil and uncourteous, but can hardly be construed into such negligences or crimes as would be a good cause of dismission. Civil tribunals are not competent to enforce the laws of courtesy and good breeding.

3. The last cause assigned by the council, is " his loss of the confidence of a large portion of his parishioners in his moral honesty and integrity." This finding of the council is vague and general. A " *large portion* " of his parish may mean a minority or a majority. In this case, it probably includes only a minority ; for but a short time before the council was convened, the parish declared by vote, that they were entirely satisfied with the plaintiff, except as to ministerial exchanges. If a majority of the parish believed him to be deficient in " moral honesty and integrity," they probably would have made this one of the charges against him.

This specification is of great importance. No clergyman can hope to perform his sacred duties successfully to a people who distrust his integrity. If he has deservedly forfeited their confidence, he must have been guilty of conduct which would be a good ground for his discharge. If he has lost it without fault on his part, it would be a great misfortune to him, a good reason for his retiring from his connexion with them, but no legal cause for his dismission. Here is no charge, much less proof, of any such conduct, on the part of the plaintiff, as should shake the confidence of his parishioners in his " moral honesty." They, therefore, having capriciously and causelessly withdrawn their confidence, cannot allege their own misconduct as a ground for their discharge from the contract which they had entered into.

We are, therefore, of opinion, that the facts found by the council are insufficient to operate as a dissolution of the ministerial and parochial relation between these parties.

*Defendants defaulted.*